In the matter of the probate of a paper purporting to be the last will and testament of CATHERINE MCLAUGHLIN, deceased.

[Decided February 7th, 1905.]

1. The fact that a testatrix had great confidence in her brother, and appealed to him for advice, and accepted from him assistance and counsel in the management of her business, cannot be made the sole foundation for a claim that he improperly influenced her in favor of his children.

2. Where a testatrix, after the execution of a will, drawn according to instructions given one who conveyed them to the draughtsman, has the executed will in her possession a sufficient length of time, and with the opportunity and ability to acquaint herself with its contents, and she then preserves it, it will be conclusively presumed that the will was prepared according to her instructions, especially when it follows her pronounced intentions and provides for no unnatural disposition of her estate.

---

On appeal from Middlesex orphans court.

*Mr. Theodore B. Booraem,* for the appellants.

*Mr. Theodore Strong,* for the respondents.

BERGEN, VICE-ORDINARY.

Catherine McLaughlin was unmarried, her nearest relatives being a brother, Charles, and sister, Mary Foyle. Her intimacy with her brother and his family was extremely close and friendly, while, on the other hand, she was estranged from her sister, because of a real or fancied wrong done her by her sister many years before her death, the evidence showing that her sister had not been at the house of testatrix for nearly seventeen years, until the day before her death, although during all of this time they had resided in the city of New Brunswick.

On the day of her death the testatrix executed her last will and testament, by which she gave all of her estate, excepting $25 bequeathed to her sister, to the executors named in the will, in trust, to hold until the youngest child of Charles reached the age of twenty-one years, when it is to be equally divided among his children, and appointed two of the sons of her brother as executors. This will was admitted to probate by the surrogate of the county of Middlesex, from whose order an appeal was taken to the orphans court of that county, which resulted in a decree annulling the order of the surrogate. The present appeal brings up for consideration this decree of the orphans court. The formalities attending the execution of the will required by law were sufficiently observed to sustain the judgment of the orphans court that it was properly executed, but I find no sufficient proof to sustain the finding below that undue influence, as defined by our courts, was exercised, or that the free agency of the testatrix was so destroyed as to constrain her to do that which she would not have done if left to herself. On the contrary, the disposition of the property followed the declared intentions of the testatrix announced by her on more than one occasion prior to the execution of the will, and owing to the enmity which she felt towards her sister, and the kindly relations existing between her and her brother Charles and his family, the property was left by this will to those who would naturally expect to be the recipients of her bounty. That she had great confidence in her brother, appealed to him for advice, and accepted from him such assistance and counsel in the management of her business as she had a right to expect from one

standing in so close a relation, and that this brother rendered such service, cannot and ought not to be made the foundation and sole support of the claim here made that he improperly influenced her in favor of his children. There should be proof of other facts or circumstances from which it may be fairly inferred that the will of the testatrix was dominated by the brother and her free agency thereby destroyed. Upon a careful review of all of this evidence, I cannot but conclude that the situation surrounding the preparation and execution of this will is similar to the conditions existing in *Gilman* v. *Ayer, 47 Atl. Rep. 1049; affirmed in 63 N. J. Eq. (18 Dick.) 806.*

The really important, and, in fact, only question worthy of consideration is, did the testatrix have that knowledge of the contents of her will which the law requires in order to make it a lawful testamentary declaration of the wishes of the testatrix? The testimony shows that about a week before the will was executed the testatrix spoke to her brother Charles and told him that she wanted to make a will, giving him directions as to the manner in which she desired to dispose of her property, and that he agreed to come down the next morning and attend to it; that on the following morning he found her much better and said to her, "I don't think you want to make a will," and she replied that she was feeling much better than she had for the last few days and the matter was not then further discussed. On the following Monday, being the day of her death, her brother saw her early in the morning, and she told him that she felt very badly and said, "I want you to attend to this will immediately; I want you to go to Mr. Elmendorf and take your son with you and have this will fixed as I dictate to you right off," and in response to his sister's request the brother went to Mr. Elmendorf and repeated to him what his sister had dictated, she having, as he testified on that morning, repeated her directions, with the exception that she added to them a gift of $25 to her sister as a recognition of her first visit to the testatrix in seventeen years, made between the day when the instructions were first given and the latter day. The brother, Charles, testified that the directions given him by his sister were faithfully repeated to Mr. Elmendorf, who made pencil memo-

randa from which the will was afterwards prepared. These
memoranda were preserved and put in evidence and in all
material particulars correspond with the will as drawn. After
preparing the will Mr. Elmendorf went to the house of the tes-
tatrix with it, taking with him Hugh McKeag to witness the
execution; that shortly after they arrived he said to the testa-
trix, "We have come to witness your last will and testament,
shall I read it to you?" to which the testatrix made no reply,
but shook her head indicating he should not; he then handed
to her the paper, and she looked to her brother in an inquiring
sort of a way, who said, "That is all right, Kate, I know it is
all right;" then the testatrix opened the paper, put on her
glasses, and as she did so Mr. Elmendorf turned and walked a
few steps away, towards the window, to give her a chance to
read the will; after standing there, as he now estimates about
a minute, he heard something said which indicated that the
testatrix was about to sign the will, he turned, walked over to
the table where she was sitting, and found that she had already
written the first four letters of her name; he then watched her
finish the signing, read to her the attestation clause, which is
in full form, and requested McKeag to sign his name as a wit-
ness, which he did, following which Mr. Elmendorf subscribed
his name as a witness, folded the paper, handed it to the testa-
trix, saying "here is your will," and when he and McKeag left
the testatrix had the will in her possession. Mr. McKeag, the
other witness, displayed so much forgetfulness, if not ignor-
ance, that his testimony is of very little assistance. He testifies
that the will was not read to the testatrix; that she had the
opportunity to read it; had it in her hands, and that it was
given to her to read, but he thought she did not read it; that
it appeared to him that she was satisfied with the will from the
answer Mr. McLaughlin gave to him, the witness, when he
asked him what it was, which was that it was merely a paper
making his sons executors of this estate; that that was all he,
the witness, knew about it, and that he "didn't think it was im-
portant as to the exact words used."

On the argument it was most earnestly insisted that the tes-
tatrix was led to believe that she was merely appointing execu-

tors and making no disposition of her estate, and that her brother Charles so completely dominated his sister that when he told her "that is all right, Kate; I know it is all right," he was deceiving her with the belief that she was simply appointing executors. I cannot accept this view. The testatrix, although very ill, was, according to the weight of the testimony, possessed of all her mental faculties. She could read and write, and for many years had managed her own business, collecting moneys due her and making loans thereof, and is spoken of by the witnesses as being a sharp, bright woman. I do not believe that McKeag remembers the whole conversation when he says he was told that the paper merely provided for the appointment of executors. His statements are so desultory and unsatisfactory as to prevent their acceptance as a basis for the alleged deception, and I am disposed to consider the remark made by the brother, testified to by Mr. Elmendorf, as an assurance that the paper contained her wishes as expressed to him, and that when he said "I know it is all right," he had reference to his knowledge of its contents, derived from the reading of the will to him by Mr. Elmendorf, after its preparation, when, as Mr. Elmendorf says, he compared the will with the memoranda and checked it, to see if he had included all the legatees. This language will certainly bear this interpretation, and in the absence of any proof of fraud, presumptions in favor of honest dealing should prevail. Nor do I believe that a person of the attainments possessed by this testatrix supposed she was taking all this trouble simply to appoint persons to administer her estate.

The testimony of the brother is assailed because, as the father of the favored legatees, he is greatly interested, and also for the reason that, according to the testimony of two of the daughters of Mary Foyle, namely, Annie and Catharine (their mother having died since the commencement of the proceedings), they were at the house of the testatrix from about six o'clock in the morning until her death, and overheard the brother insisting that the testatrix should do something which she appeared to be reluctant to do. But I am satisfied that all that these witnesses testified happened may have reference to some other matter, especially so in view of their testimony as to what occurred with

regard to the endorsement of a note or notes, or the signing of a check, that morning between the testatrix and her brother, and in considering this testimony it should be borne in mind that the respondents are as much interested in the result and perhaps more so than the brother, because if the decree below should be affirmed they will take one-half of this estate. However, if we accept the construction contended for by the respondents, it would not prove that the contents of the will were not in accordance with the wishes of the testatrix.

In addition to the fact that the directions for the preparation of this will were given by the testatrix; that the will was placed in her hands for the purpose of being read by her before its execution; that she did not immediately sign it, but had it in her possession before doing so for a short time; that after it was signed by her, the attestation clause was read and assented to by her, it also appears by the testimony of Charles McLaughlin, Jr., one of the legatees, that this testatrix had this will in her possession; that she was reading and did read it, and spoke to him of some of the contents, and manifestly, if she had been deceived and her instructions had not been followed, she would then have denounced the fraud and destroyed the will. It is urged that this testimony ought not to be accorded any weight because of the great interest the witness had in the result of this litigation. I have considered that, but in the absence of any proof of his want of integrity I think it is entitled to credence. Besides this, it clearly appears that this will was left in the possession of the testatrix, and was simply a folded paper, not enclosed in any wrapper, and subject to an immediate reading, and the presumption should be that she read it. If a will has been in the hands of a testator a sufficient length of time before its execution to permit the reading of it, it is well settled that the testator is presumed to have read it, assuming that he had the ability to read, and I think the same presumption ought to exist where the testator, after the execution of a will, drawn according to instructions given to one who conveys them to the draughtsman, has the executed will in his possession a sufficient length of time and with the opportunity and ability to acquaint himself with the contents. And if, after such opportunity, he

preserves it, the presumption that it was prepared according to his instructions becomes conclusive, especially when, as in this case, it follows his pronounced intentions, and provides for no unnatural disposition of his estate.  I am satisfied that this will expresses the intention of the testatrix; that no fraud was practiced or undue influence exercised, and that, while that care and carefulness which a member of the bar should exercise in acquainting the testatrix with the contents of her will was not shown, yet nevertheless I am convinced from all the evidence that this testatrix knew the contents of this will, and that it expresses her uncontrolled wishes.  It therefore follows that the decree of the orphans court should be reversed, and I will so advise.